2023 IL App (1st) 221064-U

FIRST DIVISION
November 20, 2023

No. 1-22-1064

NOTICE: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | Appeal from the |
| Respondent-Appellee, | ) | Circuit Court of |
| | ) | Cook County. |
| v. | ) | |
| | ) | No. 04 CR 28617 (02) |
| BRANDON COLE, | ) | |
| | ) | Honorable |
| Petitioner-Appellant. | ) | Timothy Joseph Joyce, |
| | ) | Judge Presiding. |
| | ) | |

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court. Justices Pucinski and Coghlan concurred in the judgment.

**O R D E R**

¶ 1   *Held*:   The circuit court's dismissal of the petitioner's *pro se* petition is reversed. The *pro se* petition made a substantial showing of appellate counsel's ineffectiveness for counsel's failure to argue that the circuit court improperly admonished the jury under Illinois Supreme Court Rule 431(b) (S. Ct. R. 431(b) (eff. March 21, 2007). Because the State concedes the Rule 431(b) instructional error and we find that the evidence at the petitioner's trial was closely balanced, for purposes of judicial economy, we vacate the petitioner's conviction and remand for a new trial.

¶ 2      After a jury trial in the circuit court of Cook County, the petitioner, Brandon Cole, was convicted of two counts of attempted murder and sentenced to 30 years' imprisonment.[1] The petitioner now appeals from the second-stage dismissal of his petition for relief pursuant the Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2018)). He contends that the circuit court erred in not permitting his petition to proceed to an evidentiary hearing because he made a substantial showing that he was denied his constitutional right to the effective representation of appellate counsel, when, on direct appeal, counsel failed to argue that the circuit court improperly admonished the jurors pursuant to Illinois Supreme Court Rule 431(b) (S. Ct. R. 431(b) (eff. March 21, 2007)). The petitioner further asserts that by failing to amend his *pro se* postconviction petition to include this claim of ineffective assistance of appellate counsel, postconviction counsel failed to provide him with reasonable assistance as required under Illinois Supreme Court Rule 651(c) (eff. July 1, 2017)). For the following reasons, we reverse the circuit court's dismissal of the petitioner's *pro se* postconviction petition, vacate the petitioner's conviction, and remand for a new trial.

¶ 3                                    II. BACKGROUND

¶ 4      The record before us is long and reveals over two decades of error-fraught procedural history. Beginning in December 2004, the petitioner was charged together with codefendant Christopher Flint, with *inter alia*, two counts of attempted first degree murder for his involvement in the shooting of two victims, Zachary Parson and Tiffany Space. In July 2007, the petitioner and

---

[1] As shall be discussed in more detail below, the petitioner was initially sentenced to two concurrent terms of 20 years' imprisonment. After his direct appeal, however, the original sentence was vacated, and the cause remanded to the circuit court for imposition of mandatory consecutive sentences. The petitioner was then resentenced to two consecutive terms of 15 years' imprisonment, for a total of 30 years.

codefendant Flint proceeded with simultaneous but separate jury trials.

¶ 5                                      A. Jury Selection

¶ 6      During *voir dire* in the petitioner's case, the circuit court questioned four separate panels of prospective jurors, each of which yielded at least one juror. Jurors Ericka Bustos and Elisabeth Luna were selected from the first panel. Jurors Margaret Tolson, Joseph Turchany, Ruby Barnes, Myrna Ahser-Monzon, Gail Opila, Walter Kiwan, and Nancy Koulogeorge were selected from the second panel. Jurors Tori Clay and Juan Valesaco were selected from the third panel, and juror Clarence Simmons was selected from the fourth.

¶ 7      Relevant to this appeal, during *voir dire*, in compliance with Illinois Supreme Court Rule 431(b) (eff. March 21, 2007), the circuit court admonished each of the four prospective jury panels, as separate groups, that the following three propositions were fundamental legal principles applicable to the petitioner's trial: (1) a person accused of a crime is presumed innocent of the charges against him; (2) the State is required to prove its case beyond a reasonable doubt; and (3) the petitioner does not have to prove his innocence or present any evidence at his trial. The circuit court, however, never informed the jury of the fourth requisite Rule 431(b) principle, *i.e.*, that the petitioner's decision not to testify at trial cannot be used against him. See. S. Ct. R. 431(b) (eff. March 21, 2007).

¶ 8      After making the first three admonishments, the circuit court questioned each of the four jury panels as to their understanding of those admonishments. The court's questioning and the jurors' responses were varied.

¶ 9      With the first jury panel, which included jurors Bustos and Luna, the circuit court addressed the group and inquired: "Do all of you understand [t]hat those principles apply to this case. Anybody have a problem with any of these principles of law that I just told you about, let me know

right now." The transcript of the *voir dire* reveals that there was "[n]o audible response."

¶ 10    Similarly, with the third jury panel, which included jurors Clay and Valesaco, the circuit court asked, "Do all of you understand that those principles apply to this case?" After an affirmative response from the group, the circuit court asked another question: "Anybody have any problems with those principles, let me know please." Once again, the transcript reveals there was "[n]o audible response."

¶ 11    With the second and fourth panels, which included jurors Tolson, Turchany, Barnes, Ahser-Monzon, Opila, Kiwan, Koulogeorge, and Simmons, the circuit court asked only one question: "Do all of you understand that those principles apply to this case?" to which the prospective jurors responded affirmatively or by nodding.

¶ 12    After the court's admonishments, the parties proceeded to question the prospective jurors individually. During this questioning only some of the jurors were asked about their understanding of the petitioner's right not to testify at his own trial. Specifically, defense counsel asked juror Bustos, "If [the petitioner] decides not to testify, would you be okay with that?" to which she responded, "Yes." Defense counsel subsequently asked five more jurors (Tolson, Barnes, Turchany, Clay, Velasco, and Simmons) if they would hold the petitioner's failure to testify against him, and they all answered that they would not. The transcript reveals, however, that the remaining five jurors (Luna, Ahser-Monzon, Kiwan, Opila, and Koulogeorge) were never individually asked any questions about the petitioner's decision to testify at trial.

¶ 13                                B. Jury Trial

¶ 14    Once the jury was selected, the State proceeded with its case-in-chief, during which the following relevant evidence was adduced.

¶ 15    One of the victims, Parson, first testified that at about 3 a.m. on November 14, 2004, he

4

was at a friend's house when he received a telephone call from his girlfriend, Space. Parson and Space went to a restaurant and a liquor store, before proceeding to Parson's residence at 1818 North Long Avenue, around 4:45 a.m.

¶ 16    Parson admitted he had been up since 11 a.m. the previous morning, and that he had ingested an "ecstasy" pill around 6 p.m. In addition, he drank about half a pint of cognac before picking up Space. He therefore acknowledged that by the time he and Space arrived at his residence, it would be fair to say that he was both tired and a bit intoxicated.

¶ 17    Once there, Parson parked the car a few houses away from his home. As he and Space exited the vehicle, Parson noticed someone hiding behind his grandfather's pickup truck on the opposite side of the street. Parson initially denied knowing or telling the police who that person was, but later admitted on cross-examination that he told the police that it was codefendant Flint, whom he had known for ten years.

¶ 18    Parson further testified that as he and Space approached the iron gate in front of his residence, he saw the petitioner, who was his lifelong friend, walking up to them from the street. Parson asked the petitioner, "What's going on?" The petitioner responded, "It's hot around here," which Parson understood to mean there was a strong police presence in the area. Parson denied that he addressed the petitioner with, "What's up Chris?" and instead claimed that he said, "What's up Cheese?" because "Cheese" was the petitioner's nickname.

¶ 19    Parson next averred that he opened the iron gate and let Space and the petitioner into his front yard. Parson then approached his front door and put his key in the lock to open it. As he did so, he heard a gunshot and saw a flash. Parson heard six shots and saw that they were coming from a revolver held by the petitioner, who was standing about three of four feet to his left. Parson was

shot four times, in his stomach, leg, and arm before he fell down.

¶ 20    When questioned about what he told the police about the weapon used by the petitioner while in the hospital, Parson stated that he could not recall what he said. Specifically, he did not remember failing to mention that the petitioner had a revolver. Nor could he remember telling the detectives that he did not know what type of firearm the petitioner had used.

¶ 21    Parson further testified that while on the ground, he saw codefendant Flint run up to the iron gate and start firing a revolver at Space, who until then, had been standing to Parson's right. Parson heard six shots and saw Space fall to the ground. When the shooting stopped, the petitioner and codefendant Flint ran into an alley across the street where a car was waiting, while Parson used Space's cell phone to call "911." At trial, Parson claimed that he could not recall the color of the vehicle.

¶ 22    Once the police arrived, Parson spoke to detectives while being treated inside the ambulance. He told them that he had been shot by the petitioner and codefendant Flint and that both assailants lived near Wabansia and Cicero Avenues.

¶ 23    Parson was subsequently taken to a hospital, where he underwent surgery for multiple gunshot wounds. The following morning, Parson identified the petitioner and codefendant Flint from photo arrays, which the detectives brought to him at the hospital. He also made in-court identifications of both men at trial.

¶ 24    Parson also testified that a few days prior to the shooting, he went to the petitioner's home with another friend. When they arrived, they discovered that the petitioner's door had been kicked in and that the petitioner's home had been burglarized. Parson believed that the burglary might have occurred while the two of them were together. The following day, the petitioner asked Parson if he knew anything about the burglary and Parson told him that he did not. Parson believed that

"the matter was over at that point."

¶ 25     At trial, Parson also acknowledged that he had three prior felony convictions: one for drug conspiracy and aggravated unlawful use of a weapon (in 2006); and one for possession of a controlled substance (in 2002).

¶ 26     Space next testified consistently with Parson regarding the events that transpired before the petitioner picked her up on the night the shooting. In addition, she averred that as she and Parson approached the iron gate in front of Parson's house, a man, whom Parson seemed to know, jogged up to them saying, "It's hot out here, Joe." Space had never seen this man before and could not identify him later because she did not pay much attention to him.

¶ 27     Space testified that as they all entered the front yard, Parson attempted to unlock his front door. As he did so, Space, who was standing to Parson's right, heard gunshots and then saw the man on Parson's left shooting at him. She did not actually see a gun but rather observed sparks coming from what appeared to be the man's "coat pocket." Space saw Parson put his hands up to defend himself and heard him saying, "That's how you going to get down on me, man?" As Parson fell to the ground, Space attempted to dial "911" but was shot herself and fell next to him.

¶ 28     Space testified that she did not know how many shots were fired but that once the shooting began "it was continuous" and lasted about 15 seconds.

¶ 29     Space suffered gunshot wounds to the abdomen, neck, back, hip and buttocks. She underwent surgery and spent five days at the hospital.

¶ 30     On cross-examination, Space acknowledged that although at the time of the shooting she had been dating Parson for seven or eight months, she had never met any of his friends, and therefore did not know either the petitioner or codefendant Flint. Space also acknowledged that

she had a prior conviction for possession of a controlled substance.

¶ 31    Chicago Police Detective Steve DeSalvo next confirmed that at about 5 a.m. on the morning of the shooting, he spoke to Parson at the scene of the crime, while Parson was being treated in the back of an ambulance, and that Parson identified the petitioner and codefendant Flint as his assailants. Parson did not provide the detective with a description of the shooters but told him that they lived near Wabansia and Cicero Avenues. Soon thereafter the police learned that codefendant Flint's known address was 4864 West Concord Place, which was a block away from that corner.

¶ 32    Chicago Police Sergeant Brian Holly next testified that at about 5:40 a.m. on the morning of the shooting, he proceeded to the Concord address. There, he observed a maroon-colored Pontiac pull over and park in the cul-de-sac in front of the address. Two African American males came out of the gangway of the building and entered the Pontiac. The sergeant called for backup and followed the Pontiac to 716 North Cicero Avenue, where he stopped the vehicle. The sergeant handcuffed and detained all three individuals who were inside, including the petitioner and codefendant Flint.

¶ 33    On cross-examination, Sergeant Holly agreed that the Pontiac had not been violating any traffic laws before it was stopped. He also acknowledged that once the vehicle was stopped none of the men attempted to flee and were instead cooperative with the police. Sergeant Holly further acknowledged that there were no firearms inside the vehicle or on any of the men, and no blood on their clothing or persons.

¶ 34    The evidence offered at trial further established that once the petitioner and codefendant Flint were brought to the police station, they were immediately swabbed for gunshot residue. Forensic testing of those swabs revealed that both men tested negative for gunshot residue. As

Illinois State Police Crime Lab forensic expert Brian Berk explained, while a small amount of gunshot particles was present on both men's hands, there was an insufficient amount to positively conclude that either of them had fired a weapon.

¶ 35    At trial, Chicago Police Detective Arthur Young next testified that about three hours after the shooting he spoke to Parson in the hospital and showed him photo arrays from which Parson identified the petitioner and codefendant Flint. On cross-examination, Detective Young acknowledged that contrary to Parson's testimony at trial, when he spoke to Parson at the hospital, Parson told him that he addressed the man who approached him at his front gate, and subsequently shot him, with "What's up Chris?" and not "What's up Cheese?" Detective Young acknowledged that he memorialized this statement by Parson in his police report. On cross-examination, Detective Young further acknowledged that contrary to Parson's testimony at trial, Parson told him that he did not know what type of firearm the petitioner had used.

¶ 36    Additional evidence offered by the State at trial established that although the police recovered bullet fragments from the scene of the crime, they never recovered the firearm used in the shooting. The police also found no fingerprints at the scene. In addition, while the police searched the petitioner's girlfriend's home, they found no weapons, bloody clothing, or other incriminating evidence there.

¶ 37    After the State rested, the petitioner presented no evidence in his defense.

¶ 38    In closing, the State argued that Parson was a credible witness and that he had clearly identified the petitioner as his shooter. The State argued that the petitioner wanted to shoot Parson because he believed that Parson had broken into his home a few days prior to the shooting.

¶ 39    In response, defense counsel argued that Parson was not a credible witness. Counsel emphasized that Parson was a convicted felon, and that he was tired and had been under the

influence of drugs and alcohol immediately prior to the shooting. Counsel further posited that Parson's account of events was contradicted by the testimony of Space and Detective Young, which suggested that only one shooter was involved, namely codefendant Flint. In addition, counsel pointed to the lack of physical evidence connecting the petitioner to the crime and argued that the State's theory regarding the petitioner's motive was weak and undermined by Parson's own testimony that he may have been with the petitioner at the time of the burglary.

¶ 40    During deliberations, the jury sent three notes to the judge. The first note asked for a transcript of Parson's testimony, which the court provided over defense counsel's objection that the jury should also have Detective Young's impeachment testimony. The second note stated: "Zach [Parson] is a victim and he is also a witness to the crime. As a victim[,] can he be the primary witness?" The trial judge instructed the jury to "consider all the testimony and evidence they have heard." The third note stated, "One juror began to cry and refuses to choose an innocent or guilty verdict. She wants to know if an alternate can be used." The judge responded, "Alternate cannot be used. All jurors should continue to deliberate."

¶ 41    The jury subsequently found the petitioner guilty of, *inter alia*, both counts of attempted first degree murder. The court sentenced the petitioner to two concurrent 20-year terms of imprisonment.

¶ 42    On appeal, the petitioner challenged the sufficiency of the evidence to convict him and argued that he was denied his right to effective representation of counsel where counsel failed to, *inter alia*, file a motion to quash arrest and suppress evidence. On May 8, 2010, we affirmed the petitioner's conviction, but vacated his sentence as "void" because Illinois law required that the two concurrently imposed 20-year terms be served consecutively. See *People v. Cole*, No. 1-08-0761 (May 8, 2010) (unpublished order pursuant to Illinois Supreme Court Rule 23). We therefore

remanded the matter to the circuit court for resentencing.

¶ 43    Two months later, on May 7, 2010, while resentencing was still pending before the circuit

court, the defendant filed a *pro se* postconviction petition alleging, *inter alia*, that the circuit court

violated Supreme Court Rule 431(b) (eff. March 21, 2007) by failing to ask potential jurors

whether they both understood and accepted the principles set out in that Rule. In support, the

petitioner attached copies of the *voir dire* transcript.

¶ 44    On July 19, 2010, even though the petitioner was not yet resentenced, the circuit court

summarily dismissed the petitioner's *pro se* postconviction petition finding that his claims were

patently without merit.

¶ 45    The petitioner appealed from that dismissal, contending that his *pro se* petition had stated

a claim of ineffective assistance of appellate counsel for counsel's failure to argue that the circuit

court failed to properly admonish the jury venire as is required under Supreme Court Rule 431(b)

(eff. March 21, 2007).

¶ 46    On September 21, 2012, a divided panel of this court affirmed the summary dismissal of

the petitioner's *pro se* petition. *People v. Cole*, 2012 IL App (1st) 102499, ¶¶ 16-22. The majority

concluded that the merits of petitioner's allegations could not be considered on appeal because his

*pro se* petition did not specifically argue appellate counsel's ineffectiveness. *Id*. In addition, the

majority held that because a Supreme Court Rule 431(b) violation does not implicate constitutional

rights a claim implicating that Rule could not be raised in a postconviction petition. *Id*. The

majority further held that regardless of whether a constitutional right was implicated, there was no

Rule 431(b) violation because the circuit court sufficiently admonished the jury venire. *Id.*

¶ 47    The dissent disagreed, finding that when liberally construed the petitioner's *pro se* petition

sufficiently raised a claim of ineffective assistance of appellate counsel for counsel's failure to

raise a Rule 431(b) violation. *Id.* ¶ 46 (Gordon, J., dissenting). It noted that appellate counsel's ineffectiveness was a constitutional issue that could be raised under the Postconviction Hearing Act. *Id.* The dissent further disagreed with the majority's analysis of the Rule 431(b) violation. *Id.* It noted that there was "no dispute between the parties that" during *voir dire* "the trial court consistently failed to inform every panel about the fourth []principle: 'that the [petitioner's] failure to testify cannot be held against him or her.' " *Id.* ¶ 47 (Gordon, J., dissenting). The dissent rejected the notion that some "sporadic questioning" of "only some of the potential jurors" about that principle, by trial counsel instead of the judge, satisfied the requirements of Rule 431(b). *Id.* It also noted that the majority overlooked the "closely balanced" prong of the plain error doctrine in ruling that the petitioner could not establish appellate counsel's ineffectiveness. *Id.* ¶ 46 (Gordon, J., dissenting).

¶ 48    The dissent ultimately (and in our view correctly) concluded that regardless, the petitioner's appeal should have been dismissed without prejudice because under the Postconviction Hearing Act, a petitioner must have a "conviction" in order to be able to file a petition, and here, there was no "conviction" since the petitioner was never resentenced upon remand to the circuit court after his direct appeal. *Id.* ¶¶ 48-55 (Gordon, J., dissenting).

¶ 49    A year and a half after the entry of our decision affirming the summary dismissal of the petitioner's *pro se* petition, on May 15, 2014, the circuit court finally held a resentencing hearing pursuant to this court's 2010 direct appeal order. The circuit court resentenced the petitioner to two 15-year terms to be served consecutively, effectively increasing the petitioner's aggregate sentence from 20 to 30 years' imprisonment.

¶ 50    The petitioner appealed his new sentence alleging that it was unlawful and the product of ineffective assistance of trial counsel. On March 30, 2016, this court affirmed the petitioner's new

sentence. *People v. Cole*, 2016 IL App (1st) 14166.

¶ 51   While that appeal was pending, on January 4, 2016, the petitioner filed the instant pleading, which he titled, "Leave to File a Successive Postconviction Petition." The petitioner argued that he met the "cause and prejudice test" for filing a successive petition because his original postconviction petition was both invalidly filed and dismissed before a final judgment was ever entered in his case, *i.e.*, he was resentenced on remand as ordered by this court on direct appeal.

¶ 52   The petitioner's "successive petition," which was attached to his motion for leave to file, alleged, *inter alia*,: (1) that he was provided with ineffective assistance of appellate counsel  where "appellate counsel failed to raise meritorious issue(s) on direct appeal that could have and should have been raised"; and (2) that his due process right were violated when the circuit court: (a) failed to properly assure that juror Luna understood and accepted that the petitioner did not have to testify and that his decision could not be used against him as is required under Supreme Court Rule 431(b) (eff. March 21, 2007) and (b) instead "coerced" a verdict in an otherwise "weak" case by forcing "a juror" to deliberate even after a jury note indicated that she was crying and asking to be replaced with an alternate.

¶ 53   After the petitioner filed this pleading, the case was inexplicably continued over the next four years for the appointment of postconviction counsel. Finally, on November 7, 2018, the circuit court appointed Teena Sneed from the Office of the State Appellate Defender.

¶ 54   On February 14, 2020, postconviction counsel Sneed filed a certificate pursuant to Illinois Supreme Court Rule 651(c) (eff. July 1, 2017) certifying that: (1) she had consulted with the petitioner by letter and phone; (2) obtained and examined the record of the proceedings in the petitioner's case; and (3) determined that there was no need to file a supplemental petition because the *pro se* petition adequately set forth the petitioner's claims of deprivation of his constitutional

rights.

¶ 55    Six months later, on August 17, 2020, postconviction counsel Sneed retired, and a new postconviction counsel, Kristine Underwood from the Officer of the State Appellate Defender, had to be appointed.

¶ 56    On November 29, 2021, the State filed a motion to dismiss the petitioner's *pro se* postconviction petition. The State initially conceded that because the petitioner was never resentenced and therefore never convicted for purposes of the Act when he filed his 2010 *pro se* postconviction petition, that petition was invalid, and his present pleading should be considered his initial *pro se* petition. The State then sought second stage dismissal of the instant *pro se* petition arguing that the petitioner had failed to make a substantial showing of any of his claims.

¶ 57    On May 31, 2021, postconviction counsel Underwood filed a response to the State's motion to dismiss. On June 29, 2022, the circuit court granted the State's motion, finding, *inter alia*, that the petitioner failed to make a substantial showing of a constitutional claim of ineffective assistance of appellate counsel. The petitioner now appeals from the second stage dismissal of his *pro se* petition.

¶ 58                                    III. ANALYSIS

¶ 59    At the outset, we note that on appeal the parties agree that the instant *pro se* pleading was properly treated as the petitioner's first postconviction petition because his prior 2010 petition was improperly filed and ruled upon at a time when he was not yet "convicted" of any offense for purposes of the Postconviction Hearing Act (725 ILCS 5/122-1 *et seq*. (West 2008)). See *People v. Hager*, 202 Ill. 2d 143, 149 (2002) ("[A] 'conviction' is a term of art "that means a final judgment that includes both a conviction and a sentence." "[A] defendant who is not 'convicted' cannot file a postconviction petition."). We agree with the parties' and the circuit court's treatment

14

of the *pro se* petition as an initial postconviction filing and will therefore treat this as an appeal from the second-stage dismissal of that *pro se* petition.

¶ 60    Turning to the merits, we begin by noting the familiar principles regarding postconviction proceedings. The Post Conviction Hearing Act provides a three-stage process by which a criminal defendant may challenge his or her conviction on the basis of a substantial denial of federal or state constitutional rights. *People v. Cotto*, 2016 IL 119006, ¶ 26; see also *People v. Tate*, 2012 IL 11214, ¶ 8; *People v. Johnson*, 2017 IL 120310, ¶ 14; *People v. Hodges*, 234 Ill. 2d 1, 9 (2009). A postconviction proceeding is not an appeal from the judgment of conviction but is a collateral attack on the trial court proceedings. *Tate*, 2012 IL 11214, ¶ 8. Accordingly, issues raised and decided on direct appeal are barred by *res judicata*, and issues that could have been raised, but were not, are forfeited. *Tate*, 2012 IL 11214, ¶ 8.

¶ 61    At the first stage of postconviction proceedings, the circuit court must independently review the petition and determine whether the allegations therein, taken as true, demonstrate a constitutional violation or whether they are frivolous or patently without merit. *Cotto*, 2016 IL 119006, ¶ 26; 725 ILCS 5/122-2.1(a)(2) (West 2018); *Tate*, 2012 IL 112214, ¶ 9. If, as here, the court takes no action on the petition within 90 days after it is filed and docketed the petition is advanced to the second stage, where counsel is appointed to represent the petitioner and the State may file responsive pleadings. *Cotto*, 2016 IL 119006, ¶ 26.

¶ 62    At the second stage, the circuit court must determine whether the petition and any accompanying documentation make a substantial showing of a constitutional violation. 725 ILCS 5/122-6 (West 2016); *Tate*, 2012 IL 11214, ¶ 10. In doing so, the circuit court may not engage in any fact-finding or credibility determinations but instead must take as true all well-pleaded facts that are not positively rebutted by the original trial record. *People v. Domagala*, 2013 IL 11368, ¶

35; see also *People v. Dupree*, 2018 IL 122307, ¶ 29 ("The substantial showing of a constitutional violation that must be made at the second stage is 'a measure of the legal sufficiency of the petition's well-pled allegations of a constitutional violation, which if proven at an evidentiary hearing, would entitle petitioner to relief.' (Internal citations omitted.)").

¶ 63    Where no substantial showing of a constitutional violation is made, the petition is dismissed. *Tate*, 2012 IL 11214, ¶ 10. If, however, a substantial showing of a constitutional violation is set forth, the petition must be advanced to the third stage for the circuit court to conduct an evidentiary hearing. *Tate*, 2012 IL 11214, ¶ 10. Our review of the circuit court's dismissal of a postconviction petition at the second stage is *de novo*. *Id.*

¶ 64    In the present case, on appeal, the petitioner makes two assertions: (1) that his *pro se* petition made a substantial showing of appellate counsel's ineffectiveness pursuant to *Strickland v. Washington*, 466 U.S. 668 (1984); and (2) that he was provided with unreasonable assistance of postconviction counsel in violation of Supreme Court Rule 651(c) (eff. July 1, 2017)). Because we find appellate counsel's ineffectiveness to be dispositive, we address that first.

¶ 65    On appeal, the petitioner contends that his appellate counsel was ineffective for failing to argue that the circuit court committed a Supreme Rule 431(b) violation when it admonished juror Luna. He points out that the *voir dire* transcript attached to his *pro se* petition unequivocally establishes that the circuit court failed to instruct juror Luna that she could not use the petitioner's decision not to testify against him, and to ascertain that she understood and accepted this principle, as is required under Rule 431(b) (eff. March 21, 2007).

¶ 66    The State initially responds that the petitioner has forfeited this claim on review because he did not raise it in his *pro se* pleading. The State points out that since trial counsel never objected to the circuit court's improper Rule 431(b) admonishments at the petitioner's trial, the only way

appellate counsel could have raised this issue on direct appeal would have been by arguing first prong plain error. See *People v. Sebby*, 2017 IL 119445, ¶ 52 (holding that "[a] Rule 431(b) violation is not cognizable under the second prong of the plain error doctrine, absent evidence that the violation produced a biased jury" and that it may be raised as first-prong plain error only if the evidence is "closely balanced"). [2] The State argues that because the instant *pro se* petition did not refer to the legal concept of "first-prong plain error" and "never discusse[d] the strength of the State's evidence or whether that evidence was closely balanced" within its ineffective assistance of appellate counsel argument, the claim is forfeited. For the following reasons, we disagree.

¶ 67    The State wants to impute too considerable a burden on the *pro se* petitioner. Contrary to the State's position, a *pro se* petition is not required to allege facts supporting all elements of a constitutional claim. *People v. Thomas*, 2014 IL App (2d) 12001, ¶ 48; *People v. Mescall*, 403 Ill. App. 3d 956, 962 (2010). "Because a *pro se* petitioner will likely be unaware of the precise legal basis for his claim the threshold for survival is low, and a *pro se* petitioner need only allege enough facts to make out a claim that is arguably constitutional for purposes of invoking the Act." *People v. Thomas*, 2014 IL App (2d) 12001, ¶ 48 (citing *People v. Edwards*, 197 Ill. 2d 239, 245 (2001)); see also *People v. Mars*, 2012 IL App (2d) 110695, ¶ 32. Accordingly, "[p]etitions filed *pro se* must be given a liberal construction and are to be reviewed 'with a lenient eye, allowing [even] borderline cases to proceed.' " *Thomas*, 2014 IL App (2d) 12001, ¶ 48 (quoting *Hodges*, 234 Ill. 2d at 21). Therefore, to survive forfeiture, "the pleading must [only] bear some relationship to the

---

[2] It is axiomatic that the plain error doctrine bypasses forfeiture principles and allows a reviewing court to consider unpreserved claims of trial error under two limited circumstances: (1) when a clear or obvious error occurred and the evidence is so closely balanced that this error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error; or (2) when a clear or obvious error occurred that affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. See *Sebby*, 2017 IL 119445, ¶ 48; *People v. Bowman,* 2012 IL App (1st) 102010, ¶ 29; see also Ill. S. Ct. R. 615(a) (eff. Jan.1, 1967).

issue raised on appeal." *Thomas*, 2014 IL App (2d) 12001, ¶ 48; *Mars*, 2012 IL App (2d) 110695, ¶ 32.

¶ 68    In the present case, liberally construing the petitioner's allegations, we find that the pleading certainly set forth enough facts to make out a claim of ineffective assistance of appellate counsel on the basis of counsel's failure to argue that the circuit court committed first-prong plain error in its Rule 431(b) admonishments. The petitioner's pleading explicitly alleged: (1) that the circuit court committed a Rule 431(b) violation when admonishing juror Luna; (2) that the State's evidence "was weak"; and (3) that appellate counsel was ineffective for not raising the Rule 431(b) error with regard to juror Luna on direct appeal. The petition further argued that the circuit court "coerced" a verdict by forcing a juror to keep deliberating despite her unwillingness to do so. As part of this argument, the petition discussed the trial testimony in great detail ultimately concluding that "there can be no doubt about the weakness of the State's case." Keeping in mind that the *pro se* petitioner was likely unaware of the precise legal basis for his claim, we conclude that these allegations, albeit scattered in different sections of the petition, bear more than a sufficient relationship to the ineffective assistance of appellate counsel claim the petitioner now raises on appeal, so that the issue is not novel but rather based on the same underlying subject matter as the petition. Accordingly, we find that the issue is not forfeited. See *e.g.*, *Hodges*, 234 Ill. 2d at 21 (Declining to find that a *pro se* petitioner, who did not expressly allege in his petition that certain withheld testimony would support an "unreasonable belief" for second degree murder, forfeited the issue where he argued the same testimony would have supported his self-defense claim); *People v. Warren*, 2016 IL App (1st) 090884-C, ¶¶ 137-40 (finding that the defendant did not forfeit his claim of unreasonable assistance of postconviction counsel, where he alleged facts

supporting the claim but did not articulate the legal theory in his petition.)[3]

¶ 69    Turning to the merits, we begin by noting that claims of ineffective assistance of appellate counsel are analyzed under the same two-prong test set forth in *Strickland*, 466 U.S. 668, for analyzing ineffective assistance of trial counsel claims. *People v. Lacy*, 407 Ill. app. 3d 442, 456 (2001) (citing *People v. Colon*, 225 Ill. 2d 125, 135 (2007)); see also *People v. White*, 2021 IL App (1st) 170903, ¶ 38.

¶ 70    In the present case, under *Strickland*, the petitioner was required to make a substantial showing: (1) that appellate counsel's performance fell below an objective standard of reasonableness under prevailing professional norms; and (2) that, the petitioner was prejudiced by counsel's performance, *i.e.*, that but for counsel's failure to argue an issue on direct appeal, there is a reasonable probability that the result of his proceedings would have been different. See *Lacy*, 407 Ill. App. 3d at 456; see also *People v. Ward*, 371 Ill. App. 3d 382, 434 (2007) (citing *Strickland*, 466 U.S. at 687-94); see also *Domagala*, 2013 IL 113688, ¶ 36 (2005).

¶ 71    Because it necessarily follows that if the underlying claim had no merit, appellate counsel would have had no duty to raise in on direct appeal, to determine whether the petitioner was prejudiced by appellate counsel's failure to raise it, we must first decide its merits. See *People v. Williams*, 2016 IL App (1st) 133459, ¶ 47.

¶ 72    Here, that claim involves an alleged violation of Supreme Court Rule 431(b) (eff. March 21, 2007). Since March 2007, and therefore at the time of the petitioner's trial, this Rule has required circuit courts to "ask each potential juror individually or in a group" whether they

---

[3] Because we decline the State's invitation to find this issue forfeited, we need not address the petitioner's alternative argument that postconviction counsel failed to provide him with reasonable assistance as is required under Supreme Court Rule 651(c) (eff. July 1, 2017) by failing to amend his *pro se* petition to explicitly allege first-prong plain error.

"understand and accept[]" the following principles:

"(1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that if a defendant does not testify it cannot be held against him or her." S. Ct. R. 431(b) (eff. March 21, 2007).

Our supreme court has repeatedly held that Rule 431(b) "impose[s] an affirmative duty on trial courts to *sua sponte* ask potential jurors whether they underst[an]d and accept[]" these principles. *People v. Birge*, 2021 IL 125644, ¶ 31; see also *People v. Belknap*, 2014 IL 117094, ¶ 45 (holding that "the language of Rule 431(b) is clear and unambiguous; the [R]ule states that the trial court 'shall ask' whether jurors understand and accept the four principles set forth in the rule. The failure to do so constitutes error.") Therefore, to comply with Rule 431(b) the circuit court must: "(1) instruct[] the prospective jurors on the four principles, (2) ask[] if the prospective jurors understand those principles, and (3) ask[] if the prospective jurors accept those principles." *Birge*, 2021 IL 125644, ¶ 34.

¶ 73 In the present case, the petitioner asserts that the *voir dire* transcript attached to his *pro se* petition unequivocally establishes that the circuit court failed to admonish juror Luna regarding the fourth Rule 431(b) principle, namely that she could not use the petitioner's decision not to testify at trial against him. In addition, the transcript reveals that neither the circuit court, nor the parties subsequently mentioned that fourth principle to juror Luna when questioning her individually. The petitioner therefore asserts that in violation of Rule 431(b) the circuit court never

affirmatively ascertained if juror Luna understood and accepted that principle.[4]

¶ 74    Under this record, the State concedes, as it must, that the circuit court committed an error under Rule 431(b) when admonishing juror Luna.[5] See *People v. Ticey*, 2021 IL App (1st) 181002, ¶¶ 6, 41 (finding that the circuit court committed a Rule 431(b) error where the trial judge "made no mention at all" of the fourth principle); *People v. Cain*, 2021 IL App (1st) 191921, ¶¶ 5, 21 (same); see also *People v. Thompson*, 238 Ill. 2d 598, 607 (2010) ("The failure to address the third principle, by itself, constitutes noncompliance with the rule").

¶ 75    Nonetheless, the State asserts that this error did not rise to the level of plain error because the evidence at the petitioner's trial was not closely balanced and therefore could not have impacted the outcome of the petitioner's trial. The State therefore asserts that the issue was meritless, and that appellate counsel had no duty to raise it on direct appeal. For the following reasons we disagree.

¶ 76    It is well-settled that to succeed on a claim alleging first prong plain error, a petitioner must show that the evidence was "so closely balanced that the error alone threatened to tip the scales of justice" against him. *Birge*, 2021 IL 125644 (citing *People v. Piatkowski*, 225 Ill. 2d 551, 564-65 (2007)). In deciding whether the evidence adduced at trial was close, we "evaluate the totality of the evidence and conduct a qualitative, commonsense assessment of it within the context of the case." *Sebby*, 2017 IL 119445, ¶ 53. Trial evidence is closely balanced when the State's case comes

---

[4] Although not argued in his *pro se* petition, the petitioner now asserts (as part of his unreasonable assistance of postconviction counsel claim) that the *voir dire* transcript reveals much more than a single Rule 431(b) violation in the circuit court's admonishments of juror Luna. The petitioner correctly points out that the circuit court also failed: (1) to mention the fourth Rule 431(b) principle to any of the twelve jurors; and (2) to ask each one of them whether they understood and accepted each of the first three Rule 431(b) principles. As shall be more fully explained below, because we find that the petitioner has made a substantial showing of a Rule 431(b) violation with respect to juror Luna, which warrants remand for a new trial, we need not address these additional Rule431(b) violations in context of his unreasonable assistance of postconviction counsel claim.

[5] The State also concedes that the circuit court made errors in admonishing the remaining jurors as to Rule 431(b) and ascertaining their understanding and acceptance of each of the first three Rule 431(b) principles.

down to a "contest of credibility" between "opposing version of events," and "no extrinsic evidence [i]s presented to corroborate or contradict either version." *Sebby*, 2017 IL 119445, ¶ 63. Because a criminal defendant has "no burden to present any evidence or to testify himself at trial," evidence can be "closely balanced" even where the defendant fails to put forth a different account of events. See *Piatkowski*, 225 Ill. 2d at 567; *c.f. People v. Williams*, 2022 IL 126918, ¶ 64.

¶ 77   In the present case, contrary to the State's position, the record reveals that the evidence at the petitioner's trial was closely balanced. Aside from the testimony of one of the victims, Parson, who admitted to being fatigued and intoxicated immediately prior to the shooting, there was no evidence whatsoever connecting the petitioner to the crime or establishing that there were two shooters, instead of one. What is more, the record reveals that the jury itself found Parson's evidence problematic, as it questioned his testimony in the notes it sent to the judge during deliberations.

¶ 78   With respect to physical evidence, the record reveals that although some bullet fragments were found at the scene, the police never recovered the firearm used in the shooting or established that more than one firearm was used. Moreover, while the petitioner was detained just an hour after the shooting, he had no blood or firearm on his person. In addition, a gunshot residue test performed immediately after the petitioner was brought to the police station was inconclusive. The police also found no physical evidence whatsoever connecting the petitioner to the crime even though they searched his girlfriend's home.

¶ 79   Accordingly, the entirety of the State's case rested on the identification of a single witness, Parson, whose testimony was repeatedly contradicted and impeached by his own statements to the police, and the version of events testified to by his girlfriend, Space. Specifically, while at trial, Parson claimed to have seen an unknown person hiding behind a truck just before the petitioner

approached his front gate, he told Detective Young that the individual behind the truck was codefendant Flint. In addition, while at trial Parson claimed that he addressed the person who approached his front gate and subsequently shot him with, "What's up?" or "What's up Cheese?", he told Detective Young that he addressed the man with "Chris," which is codefendant Flint's name.

¶ 80    The testimony of the second victim, Space, similarly contradicted Parson's version of events. While Parson claimed that there were two sets of gunshots from two shooters (first the petitioner then codefendant Flint) Space testified that she saw a single shooter, whom she could not identify, and that she heard gunshots that were "all like continuous" before she fell to the ground.

¶ 81    In addition, there was very little evidence offered to support the State's theory of why the petitioner would have wanted to shoot Parson. While Parson testified that earlier in that week, the petitioner's house had been burglarized and that when Parson asked him whether he knew anything about it, he stated that he did not, he also averred that he was with the petitioner when the petitioner discovered the break-in and that he and the petitioner might have been together when it happened. Parson also testified that he and the petitioner had been friends since childhood, and that they never had any problems between them.

¶ 82    Most importantly, the jury itself appeared to struggle with Parson's testimony, as is evident from the three notes it sent to the judge during deliberations. One note asked the trial judge whether, as the "victim," Parson could also be the State's "primary witness." Another requested the transcript from Parson's testimony. The final note informed the judge that one juror was crying because she did not want to render a verdict and was asking to be replaced by an alternate.

¶ 83    Under this record, we are compelled to conclude that the evidence at the petitioner's trial

was closely balanced. See *Piatkowski*, 224 Ill. 2d at 565-66 (finding the evidence closely balanced where the State presented no physical evidence connecting the defendant to the shooting and the only evidence linking him to the crime was the conflicting testimony of eyewitnesses.) As such, the petitioner has made a substantial showing of a reversible Rule 431(b) violation with respect to juror Luna, and correspondingly appellate counsel's ineffectiveness for failure to argue this meritorious claim on direct appeal. See *Sebby*, 2017 IL 119445, ¶ 63; see also *Cain*, 2021 IL App (1st) 191921, ¶¶ 31-35 (holding that the failure to address the fourth Rule 431(b) principle in a closely balanced murder case was reversible error); *Ticey*, 2021 IL App (1st) 181002, ¶¶ 54-56 (same in a drug case).

¶ 84    The parties next disagree over the type of remedy that is appropriate under the present circumstances. The petitioner argues that in the interests of judicial economy and in light of the undisputed nature of the Rule 431(b) violation, which is apparent on the face of the record, we should vacate his conviction and remand for a new trial. See *Cain*, 2021 IL App (1st) 191921, ¶¶ 31-35 (holding that the proper remedy for the circuit court's failure to address the fourth Rule 431(b) principle in a closely balanced murder case was to remand for a new trial); *Ticey*, 2021 IL App (1st) 181002, ¶¶ 54-56 (holding that where the circuit court violates Rule 431(b) in a closely balanced case, the remedy is to reverse and remand for a new trial).

¶ 85    The State, on the other hand, asserts that if we reverse the circuit court's dismissal of the *pro se* petition, the more appropriate remedy is to remand for a third-stage evidentiary hearing because "all of the facts and circumstances to decide this claim are not already in the record."

¶ 86    The problem with the State's argument, however, is that it fails to identify even a single fact or circumstance required to decide this claim that does not already appear in the record. Nor does the State explain how or why further postconviction proceedings, such as an evidentiary

hearing, might be necessary or useful.

¶ 87    Indeed, contrary to the State's bald assertion, it is apparent that the record before us does not require any factual development. Facts regarding the circuit court's violation of Rule 431(b), which the State does not even dispute, and the closely balanced nature of the evidence offered against the petitioner are apparent from the *voir dire* and trial transcripts before us. Similarly, this court's order affirming the petitioner's conviction on direct appeal, which is part of the record, clearly establishes appellate counsel's failure to argue the Rule 431(b) violation. Accordingly, since "all the facts and circumstances" to decide the petitioner's claim "are already in the record," we see no reason to remand for a third-stage evidentiary hearing. *People v. Buffer*, 2019 IL 122327, ¶¶ 46-47 (remanding for a new sentencing hearing rather than additional postconviction proceedings where the record established a constitutional violation and no additional facts outside of the record were necessary to decide the claim).

¶ 88    For purposes of judicial economy and in light of the particular issue raised in this appeal, we therefore vacate the petitioner's conviction and remand for a new trial. See *Cain*, 2021 IL App (1st) 191921, ¶¶ 31-35 (holding that the proper remedy for the circuit court's Rule 431(b) violation is to remand for a new trial); *Ticey*, 2021 IL App (1st) 181002, ¶¶ 54-56 (same).

¶ 89    Since we do so, we need not address the petitioner's additional arguments regarding postconviction counsel's failure to provide him with reasonable assistance as is required under Supreme Court Rule 651(c) (eff. July 1, 2017).

¶ 90                                         III. CONCLUSION

¶ 91    For the aforementioned reasons, we reverse the circuit court's dismissal of the petitioner's

*pro se* petition. We further vacate the petitioner's conviction and remand for a new trial. [6]

¶ 92    Reversed; conviction vacated and cause remanded for a new trial.

---

[6] We note that retrial will not implicate double jeopardy concerns, since the trial evidence, although "closely balanced" was nonetheless sufficient, for a finding of guilt. See *Cole*, No. 1-08-0761 (May 8, 2010) (unpublished order pursuant to Illinois Supreme Court Rule 23) (affirming the petitioner's conviction on sufficiency of evidence grounds).